23-11, 729. Ms. Richardson here for the appellant, Ms. Couch here for the appellate. No hurry, whenever you're ready. I'm good to go. I don't think I will beat the previous time. All right, can I please report? My name is Ashley Richardson. I am here on behalf of Mr. Jimenez. What we have here, just briefly, is three claims that were disposed of by two different orders. The first two claims being for race and national origin discrimination and retaliation. Those were disposed of by the court via summary judgment. And about a month later, the remaining disability discrimination claim was resolved through a motion to dismiss, which the court granted with prejudice. I'm going to address those in reverse order, starting with the disability discrimination claim. What we have here is a Scribner's error. When the complaint was drafted, and it's the only complaint in this case, it states that the claim for disability discrimination was being brought pursuant to Section 504. See, I'm going to get them backwards, the one versus the four. Well, I know what you're talking about. I agree that that is your strongest argument, I think, and that's probably why you started with it. But, man, our case law suggests that a district court can enforce its scheduling order with respect to amendments. And that's just kind of what it is. I mean, I think I probably would have allowed you to amend the complaint, but the district court here said that you shouldn't identify good cause. So what is the good cause that you needed to get around the scheduling order and have a late amendment to a complaint? No, and I agree that we were well outside the timeframe for amending. That's definitely not in dispute. The court here just made the brief statement that the lack of good cause was because of a lack of diligence in ascertaining the applicable law, which is not borne out by the record. What we have is that the complaint says the incorrect section has got the four instead of the one, but the case proceeded like the next two years as if it was brought under the appropriate section. We have a full record, all of the discovery. The disability discrimination claim was submitted as part of the summary judgment. The court fully evaluated it, determined that there were disputed issues of material fact, and allowed that claim to remain. It wasn't until counsel below contacted my counsel below and said, hey, I think this other case might apply, that Ms. Maddox, counsel below, went back and sort of reevaluated, took a look at the complaint. And I guess I think you're right about, I'll just give it to you, that that's probably what happened. I guess what the district court said was, yeah, so counsel's filing this case with the wrong statute is not a good cause to allow an amendment after the fact. The fact that the government only realized, oh, you sued us under a statute that doesn't allow you to sue us. Why do you need to have a late amendment because of that? I would argue that the fact that the case proceeded as long as it did, with everyone assuming that it had been brought under the correct statute, shows that it was truly Justice Scribner's error. That nobody, the court, Ms. Maddox, opposing counsel, no one noticed until after summary judgment. So I completely agree with you there. But why does that give you good cause to go outside the scheduling order, I guess? Because it wasn't for undue delay, any bad faith. It wasn't a lack of knowledge of the applicable law. It was simply a typographical error. Maybe I'm wrong about this, but you have to identify good cause to modify the scheduling order. Just the need to amend is not itself good cause. The fact that you should be allowed to amend. The standard to amend is very liberal. You could definitely amend this if it had been within the scheduling order. No question about that. But what's the good cause to say, look, we had a reason to not do this earlier? That's, I guess, the concern that I'm having because all of this could have just been done earlier. Like, it had the lawyer, like, known what they were doing when they filed the complaint and decided to cite the right statute. There was nothing stopping the lawyer from just doing that. No, and I would agree more that the sort of specific facts here, it wasn't necessarily, or it wasn't even unnecessarily is the wrong word. It wasn't a lack of knowledge about which statute to bring the suit under. It was a typographical error. Given that they were listed sort of in, not chronological order, but numerical order, it was 794 and then 794A and then 1981, I believe, was the order that they were included. The 4 is simply a typographical error. The fact that the remainder of the complaint shows that we were pursuing damages that were only available under Section 501. If you read the whole thing together, it shows that it really was just a typographical error that was not discovered until after the expiration of that timeframe to amend. And so, but just, and this will be the last time I ask the same question. So what's the good cause for not discovering the typographical error, right? You need good cause to need the amendment post the scheduling order. So the lawyer says, I wrote this complaint, and when I wrote the complaint, I put the wrong thing in the complaint. I could see a lawyer saying, I wrote the complaint, I put the wrong thing in the complaint, and then I was hospitalized for a year and a half. And then when I came out of my coma, I read the complaint again. And, oh, my gosh, I need to amend. That's good cause to not meet the scheduling order. Here, it just is like we don't really have an explanation for why we didn't do this before. We just didn't do it because we just didn't do it. Well, and I guess, luckily for somebody, there was no coma, although I suppose that would have helped us out here. No, again, it's that there was no issues with the complaint raised at any time, and it was essentially written, drafted, and everyone proceeded as if it had been drafted correctly without the typographical error, and the case just proceeded. There was no reason, essentially, to go back. Go ahead, Judge Wilson, please. I get the impression that the district judge in this case was more influenced by the fact that maybe this was just a change of strategy, a change of mind rather than a typographical error, though. And I kind of took away the same reading of that order by the statement that it was sort of a lack of diligence to ascertain the applicable law, and that's not my understanding at all of what happened here. I was, to an extent, part of this below, and it was simply that when opposing counsel brought to light this case, the Cummings case, I believe, that was decided in 2022, Ms. Maddox disagreed with its applicability, went back, looked at everything, and that is the first time she discovered the error. And that's where I get, you know, it's like, okay, the scheduling order says the deadline to amend is a year after the suit is filed. The deadline for summary judgment is, you know, two years after the suit is filed. And this isn't a summary judgment motion, but, you know, let's say someone files a summary judgment motion and says, oh, the claim that you brought against me you can't bring. That doesn't seem like that's good cause to say, oh, I need to amend that complaint and bring a better claim. Well, and I would agree with that if it was different claims. This is just changing a single number in a claim that everyone understood throughout the pendency of this action. And it has fairly dramatic consequences, right? Extremely dramatic consequences. And I would argue that allowing – the judge already decided that there were disputed facts on this claim and that it needed to be submitted to the jury. So the strength of the claim is still there. We're essentially dismissing it on a technicality because we put a four there instead of a one. And I would submit that there was no, essentially, reason to go back and look at that complaint again. There were no issues with the complaint, no motion to dismiss, nothing that brought to light that particular issue until after the summary judgment motion when opposing counsel brings this other issue with the Cummings case to Ms. Maddox's attention. So we're essentially throwing out the entire case for a single digit typographical error when the remainder of the complaint makes clear that this is a 501 claim with all of the available damages. So maybe I'm circling back to Judge Brasher's question, but is your point that a Scrivener's error itself is good cause? That's what we would submit and that essentially throwing out the whole case on a typographical error as opposed to allowing it to be heard on the merits is an extreme response to a one digit Scrivener's error, particularly when the rest of the complaint follows what would have been brought as a 501 claim. Had we not included any of, let's say, the available damages or other remedies that were sought, I can see where there would be a bigger argument that, hey, this is what the law actually was that applied here. But the entire complaint and the remainder of the action proceeded under everybody believing that this had been brought under 501 and not 504. Just moving to the race and national origin claims, where would I find evidence in the record that the Bureau of Prisons considered race or national origin before assigning him the augmentation duties and giving him lower performance reviews or investigating him for failure to attend augmentation duties? If I went to the record to find evidence of that, where would I go? With respect to the augmentation duties, I believe we cited a number of white or non-Hispanic individuals. I don't have their names directly in front of me. Rogers is one of them who were not assigned to augmentation duty. We also have the testimony of Dr. Lee, his supervisor, that brings up the issue that this augmentation duty, with the physician specifically, was incredibly disruptive to their ability to actually practice medicine within the prison. That's it? Essentially, we have the comparators. Can I ask you a question about that? Because this is not fleshed out a lot in the briefing, but it's my understanding that this augmentation duty thing was negotiated between the union and the prison. Yes. So how is that? Was the prison violating that agreement by assigning him to augmentation duty? No, I think they were violating that agreement. In fact, I think they were complying with it, right? Like your comparators fit into the categories of people who under the MOU were exempted, correct? That is actually correct. I guess that's where I mean, and maybe you don't want to talk about this anymore, but I just don't get how there could be sort of a race-based claim saying, look, you did this because of my race, when like the union was involved in negotiating an agreement that says this is why we're going to do it. It's more cumulative than that. We have that particular issue with the augmentation duty, but then we also have the issue of the medical director position being given to a non-Hispanic employee. The fact that he was placed under investigation, there's no evidence that anybody else was for anything related to the augmentation duty. So it's more as opposed to a direct comparator on each specific issue. It's more of like that cumulative convincing mosaic situation where when we look at what happened to Mr. Hernandez, a Hispanic individual, compared to all of the other folks around him who were not Hispanic, that he was treated less favorably overall than they were. And hopefully, Judge Wilson, that answers your question as to where that sort of evidence would be on that particular issue. But it does bring up the other issue that summary judgment was granted on, which is the exhaustion of remedies, which I see that I'm running low on time on, but we would argue that under Gregory, the fact that the failure to pay that incentive pay and the medical director position would have naturally grown out of the charge of discrimination that he filed because they are, in fact, referenced in the final agency decision, and he did bring those issues verbally to the investigator. So unless there are other questions, I will. Thank you very much. All right, Ms. Couch, let's hear from you. Good morning, Your Honors, and may it please the Court. Mary Ann Couch for the United States. Dr. Hernandez's counsel raises many issues on appeal, given the way these were addressed in her opening statements. I'm happy to go ahead and proceed in the same order and first address the Rehabilitation Act claim that was dismissed, and then address the Title VII discrimination and retaliation claims. So with respect to the Rehabilitation Act claim, it's the only one that survived summary judgment, and the standard this Court has to look at is an abuse of discretion from the As Judge Brasher pointed out, I think, during Dr. Hernandez's counsel's argument, she was unable to point to anything that could establish good cause other than her theory that failure to plead under 501 under the Rehab Act was simply a scrivener's error. It can't be an abuse of discretion for the district court to have dismissed that claim when the only thing Dr. Hernandez pointed to for failure to amend earlier, 18 months earlier, 18 months had passed from the deadline to the actual attempt to amend, was that they just realized late in the game, late in the litigation after summary judgment had fully been briefed. So how did they realize that they pled under the wrong statute? It was called to their attention by counsel for the Bureau of Prisons, right? Yes, Your Honor, and that counsel was me, Your Honor. And so I do know those conversations. And so where in the stage of the litigation did that take place? Yes, Your Honor. It was after summary judgment was complete, and I was reviewing the record in that final claim that potentially was going to go to trial, and I realized that 504 was pled in the complaint. There were no damages that this plaintiff could obtain because he was a former employee under 11th Circuit precedent, and he wasn't. So I'm trying to figure out how long after you knew that they pled under the wrong statute that you advised them that they pled under the wrong statute. Immediately, Your Honor. My name is on the pleadings of this case from the very beginning. I will, in full candor to the court, I was not involved in the summary judgment briefing detailed. I was still on pleadings. But once that issue came to my attention, when I came back into the case, when this summary judgment order came out, I immediately raised the issue with counsel for Dr. Jimenez, and we immediately raised it to the court. But again... And so you moved for summary judgment, right? We already moved for summary judgment, Your Honor. This issue came up after we received the district court's order granting summary judgment in favor of the United States on the two claims under Title VII. So you could not have moved to dismiss earlier based on them deciding the wrong statute? I could. The United States could have, Your Honor. We could have immediately raised this issue, but we didn't have to because it's a matter of subject matter jurisdiction before the court in the Lane v. Pena decision. Yeah, it just seems like this is something that would normally be raised in a 12B6 motion to dismiss earlier. But it's not required, Your Honor. Just correct me if I'm wrong about the way this happens. I mean, they plead a bunch of claims in the complaint, some of which allow damages, some of which may not, depending on the statute that they're pleading under. And then you litigate those claims, and then you file summary judgment on the merits of all those claims, and the district court says, look, I'm getting rid of all of these claims except this one. And then so when the district court says, like, we're just going to draw on this one claim, that's when, like, this actually matters is that one claim, and that's when everybody's sort of realizing, oh, like, under this specific claim, there is no this other stuff you requested. Yes, Your Honor. And Dr. Ramirez's counsel representations of this was simply, like, a one-number difference. It actually had huge ramifications for how this case would proceed because the damages were entirely different. Now that he was a former employee, he could not receive monetary damages. Yes, he had pled monetary damages, but those were under Title VII. But if the district court had denied summary judgment on the other claims, the case would have just rocked along and gone to trial. And then probably what we could have had where the jury comes back on this one claim and none of the other ones, and then we'd be in this position trying to figure out what happened, right? Yes, Your Honor. At some point, you'd have to figure out what to do about this one claim. Absolutely. And so it's not just a typo of a number one to a number four, number four to a number one. It changes the actual relief that this plaintiff could get, and it's, you know, extremely prejudicial to the United States to have that possibility go forward after 18 months had expired on this issue. Eighteen months after the amendment deadline had passed, this first case was launched. I don't know about that because, I mean, so like I said, I think if I were the district judge, I probably would have just allowed this because the discovery wouldn't have progressed any differently, right? If nothing would have happened differently leading up to the amendment, it would have just been, you know, you just now had to litigate this going forward. Your Honor, I'm not sure about that. Okay. This claim under the Rehabilitation Act, of course, deals with the augmentation issue, as the entire case does. But it's specific to his claim that he had a disability and could not participate in the augmentation process. The record is not entirely clear, and it likely would have been more developed on the exact times that he was asked to participate in the augmentation procedure and when he actually participated in that, because there were multiple instances, and the record reflects, that he was called to augment but refused to do so. So it appears that there may have been five instances that he actually participated in the augmentation duties. So details on that and the extent that that affected him or didn't affect him in his mental capacity with a disability would necessarily affect sort of the strategy of the case and potentially the discovery. It's hard to speak to now, looking in hindsight, of course, but I do think that it absolutely would have weighed in the decision and the strategy for the case as a whole. If the Court doesn't have any more questions on the Rehabilitation Act claim, I'm happy to go ahead and address the Title VII claims as well. So the law on Title VII claims has evolved in recent years, which I know all of you are well aware of, with the Babb v. Wilkie decision, the subsequent decisions of the Eleventh Circuit, interpreting the standard. When I was looking back at the briefing of this case, absolutely the district court's orders on all of this should be affirmed entirely. But if you step back and look at the causation standard that's required, it's really even more straightforward and simple to look at this court's case law on discrimination and retaliation and the requirement that there be evidence of but-for causation. Let me step back. The requirement that there be evidence that the protected characteristic here, Dr. Menez's race or national origin, must be the but-for cause either of the ultimate decision here, decisions related to augmentation and other things, or the but-for cause of differential treatment. That may be something short of the ultimate decision, but under either prong, the but-for causation is still required. And there's simply no evidence in the record regarding anything about the Bureau of Prisons making decisions, any decision, whether it's an out-of-personnel decision or anything else. Isn't it a different analysis if there's public sector discrimination than private discrimination? Judge Wilson, the standard is the same. There is the how that can be applied and how a plaintiff can actually prove his or her case is different, yes, Your Honor, in the public sector. And so that case law in the public sector, applying to federal employees, has evolved in recent years. But it's made clear that the causation standard of but-for causation applies. You got a case that says that? Sure. But-for causation applies when we're looking at public sector discrimination? Yes, Your Honor. It's the BAB case that Judge Newsom has written and subsequent decisions in that. It's the Rosado opinion that came out after the briefing on this appeal. It's the Buckley decision. Your point is just that it's always but-for causation, but in the federal sector, but-for causation runs to one of two different things, depending on what the remedy you're seeking is. Yes, Your Honor. And here, of course, Dr. Jimenez was seeking monetary damages, so he would have to go forward under the first prong of the ultimate decision. And, in fact, there are some references in the briefing by Dr. Jimenez's counsel that the standard is that discrimination plays any part. There are some references, though, that seem to indicate that just a personal election is required and not an adverse personal election. That is not the law. How is that different in Buckley versus the Secretary, our 2004 opinion, where we said a federal sector employee must show that a protected characteristic played any part in the adverse employment decision? Yes, Your Honor. As opposed to the more heavier but-for analysis in private plaintiff litigation. So the statement there in Buckley, if you go back to Judge Nugent's decision in Babb and some of the subsequent decisions and Judge Rosenbaum's decision in Rosado that was after Buckley, I think Rosenbaum also authored the Buckley decision, but if you look at all of those decisions, if you go back to the Supreme Court's decision in Babb v. Wilkie, I'll point you to the Supreme Court's site there. This is the reporter's site, 1177-78. It made clear that but-for causation standard is required under either. It's just that it's possible that in the federal employment context, but-for causation doesn't affect the ultimate decision. It's still possible for that federal employee to get relief if there's evidence of but-for causation and differential treatment. But important here, Your Honors, is that there's no allegation of differential treatment. So you have to go under the first prong of ultimate decision. But again, as is made clear by Dr. Menes' counsel argument, the only thing they can point to of alleged discrimination here or any impetus for retaliation for that matter too is the fact that Dr. Menes was of Hispanic descent, and they point to two individuals who were white and did not have to do the same augmentation procedure that Dr. Menes pointed to. But they failed to point out that all individuals in his group, the Health Services Department at the Bureau of Prisons, had to augment, including his supervisor, Dr. Lee, who was of Asian and Chinese descent. So it completely counteracts their argument. They have no evidence of race or national origin discrimination. The white individuals that they point to, as Judge Brasher pointed out in the initial argument of Dr. Menes' counsel, there was a memorandum of understanding between the warden and the union at Bureau of Prisons that was entered into in 2017 before Dr. Menes ever had to take his first augmentation shift. In that memorandum of understanding, there are certain categories of employees at the Bureau of Prisons that are not required to augment. There's not details of reasons why, but certainly not any details that are based on race or national origin. Those employees are executive officers, members of the central office not at FCI Tallahassee, where Dr. Menes was located, psychologists were not required to, and there's a couple other categories. But bargaining unit employees like Dr. Menes, who was a member of the Health Services Department, was required to augment. And importantly, this augmentation duty was part and parcel of his position description. I'll point you to, in case it's not clear in our briefs, it was ECF 21-6 at page 146. That's his position description. He's a law enforcement officer first. Yes, he's a physician, but he was not in private practice down the street. He was located inside FCI Tallahassee. He has law enforcement duties as an employee of the Bureau of Prisons, and it's spelled out in his position description. Yes, he's a medical officer. Yes, he's a physician, but he's required to do law enforcement duties, including custody, including the augmentation. I also want to touch on a couple of things that Dr. Menes' counsel pointed to in an attempt, I think, to create some sort of convincing mosaic. She points to two instances that were completely barred for failure to exhaust, but potentially could be viewed by this court as evidence of a convincing mosaic, except there is none. The first is this idea that he didn't get an incentive payment or a bonus, and the second is the medical director position. With respect to the incentive payment, the record evidence is clear that it was just not renewed that year because the facility was at full capacity. It was an incentive payment because they previously had not been at full staff. With respect to the bonus issue, it's somewhat separate. The only evidence we have on that indicates that there were also nurses who didn't get the bonus at the same time, and it's not that he didn't ultimately get the bonus. It's that it was delayed because of a congressional budget issue. There was a continuing resolution. So, again, there could be no evidence of but-for causation on any of those because there are other reasons, of course, and there's no inference of discrimination. With respect to the medical director position, the facts just don't support that in any way. Dr. Menez actually testified that he didn't know if he even applied for that position. And in any event, all of those are well after the fact and barred for failure to exhaust for the reasons set out in our brief, but they certainly couldn't give an inference of discrimination. The bottom line here is under this Supreme Court's precedent and this court's interpretation of it, the way this was briefed to the court was through the prima facie case analysis under discrimination and retaliation. But you also can look at it just simply at a higher level. There's no evidence of but-for causation here. And the only thing they try to argue is as to these ultimate decisions of augmentation, of being investigated, and a variety of other issues. It just doesn't meet the standard in any way. So, Your Honors, unless you have further questions, I'll rest on my brief. Thank you very much. Thank you. All right, Ms. Richardson, you've got some rebuttal time remaining. I do. All right, so I'm just going to take these in the order that we've been going, unless the court has any direct questions to start with. First, as to the Scribner's error in the Rehabilitation Act claim, my colleague over here has said that the case would have changed dramatically had we had the one there instead of the four, but there's just no evidence that was presented below that that would actually be the case. We have a full record, complete discovery, huge filings within response to summary judgment, and the court was able to determine, hey, this is, you know, there's still disputed issues of material fact here. There's really no evidence to suggest that there would be any sort of undue burden or that some stone was left unturned because of this Scribner's error. And if that were the case, why wasn't this brought up years prior? We have, you know, this is occurring 18 months after the expiration of the time for leave to amend. So if this was such an issue that would have changed the case so dramatically, why are we waiting until 18 months after the deadline to notify anybody that this is an issue? We fully admit that it was an error that we did not catch until it was brought to our attention, but there's no explanation for this undue hardship or any kind of reason for the delay. And we would submit that it was simply a Scribner's error. It did not change the course of the case. This was going to proceed to trial until counsel noticed that there was, you know, the four instead of the one, and that dismissing Mr. Jimenez's claim that was set to go to trial at this point, or not set to go to trial, but was going to proceed forward is just too harsh a punishment for something that was essentially just a typographical error. Moving on to the Title VII claims, post BAB, we have this distinction between the but-for causation and whether or not something was sort of free of the taint of discrimination or retaliation, I think is the way it's been phrased a number of times. My understanding is that those go towards the available damages and that in order to secure certain types of damages, you need to meet that higher threshold of but-for causation. Generally speaking, what we have here is, and I obviously disagree with my counsel across the aisle, we have this sort of convincing mosaic, sort of this snowball rolling down the hill of acts that continue to happen to Mr. Jimenez as a Hispanic employee as compared to the other employees around him. Yes, we do have the issue where the white employees who didn't augment were part of, were not part of this bargaining unit. And we'll concede that there is a difference there. But overall, he, as a Hispanic man, was treated different than all of his other coworkers and counterparts. And that would be the same for national origin and race discrimination, as well as for his retaliation claim. We have that he filed, you know, his two charges. What about the Asian doctor that she mentioned? What about the Asian doctor that she mentioned who was similarly treated? Right. Well, not to be so blunt, but he's not Hispanic. Your argument is about Hispanic people specifically, not about non-white people. Yes, that's his race, and that's why it's race and national origin, is that he is of Hispanic descent. And that is the key factor that played, you know, some kind of role in the decisions that were taken against him. So we would argue that the fact that there is, you know, we have, yes, an Asian doctor was also required to augment, but he was the one that was put into that medical director position over Mr. Jimenez, who is a Hispanic individual. So that's the distinction there on that particular claim. So we would submit that under BAB and the sort of free from the taint of discrimination and retaliation that we've met that standard, there was enough evidence there that these personnel actions, which are listed out in the statute and are far broader than the sort of traditional materially adverse, something that would affect you monetarily or a termination, that sort of thing, that we put forth sufficient evidence to show that there were personnel actions taken against Mr. Jimenez that were not free of that taint of discrimination and retaliation. And we would ask that this court reverse both of the district court's orders on those grounds. Very well. Thank you both. The case is submitted, and we will be in recess until tomorrow morning at 9 a.m.